## JONES v. READING CO.
### Civil Action No. 1480.

District Court, E. D. Pennsylvania.
June 23, 1942.

Freedman & Goldstein, of Philadelphia, Pa., for plaintiff.

Henry R. Heebner, of Philadelphia, Pa., for defendant.

KALODNER, District Judge.

This case was tried before me with a jury, and resulted in a verdict for the plaintiff in the amount of $2,387.50, of which $137.50 presumably represented hospital and medical bills.

The defendant at the close of the evidence moved for a directed verdict and the motion was denied. After rendition of the verdict, defendant filed a motion to set aside the verdict and enter judgment in favor of the defendant on the grounds (1) that the plaintiff had failed to meet the burden of proving that negligence on the part of the defendant was the proximate cause of his injuries, and (2) that plaintiff was guilty of contributory negligence as a matter of law.

Defendant also moved for a new trial on the grounds that the verdict was against the law; against the evidence and the weight of the evidence; that the verdict was against the charge of the court; that the verdict was excessive; also, upon the court's refusal to grant the motion for a directed verdict for the defendant.

Plaintiff was a seaman on board a vessel which was moored to the North side of Pier C, Port Richmond—a pier owned and operated by the defendant. The plaintiff

left the vessel shortly before 6:00 P.M. on January 16, 1941, and was on his way out to the street when he fell off the edge of the pier onto the railroad tracks running alongside the pier, and about four feet below its level, sustaining the injuries for which he received the verdict.

According to the story accepted by the jury, the plaintiff, after descending the gangway of the ship, walked south across the width of the pier, and alongside cargo piled to the height of about seven feet. Proceeding thus, the plaintiff observed the end of the pier and the open space beyond it (in which the railroad tracks are laid). He also observed the end of the pile of cargo around which it was necessary for him to turn to the right, in order to obtain egress to the street. This means of egress, he said, comprised a two-foot space between the end of the pile of the cargo and the end of the pier.

The plaintiff stated that the pile of cargo alongside which he was walking extended about 16 feet. He admitted seeing the drop at the far end of the pier where the railroad tracks were, when he had traversed about half the extent of the cargo. Defendant's measurements showed that the pile of cargo extended considerably more than 16 feet, but the discrepancy has little bearing on the essential elements of the case so far as the Motion for Judgment N. O. V. is concerned.

Darkness had set in when the plaintiff left his ship and the pier was lighted by electricity. Just about the time the plaintiff reached the end of the pile of cargo, preliminary to making a right turn so as to leave the pier by the open door, which was to his right, or west of him, as he was walking along the pier, the lights of the pier were suddenly extinguished without warning. Immediately thereafter the plaintiff fell off the edge of the pier onto the railroad tracks below and was injured.

There was no witness to the fall. The plaintiff had been accompanied by another seaman when he left the boat, and his companion was walking behind him, but no testimony from his companion was forthcoming.

Exactly what occurred between the extinguishing of the lights and the fall is not clear. Only the plaintiff testified to those events, and that testimony discloses some inconsistencies, and little clarity or precision. I quote it (N.T. p. 16):

"A. Well, there was cargo until I started to make the turn. I was going to make the turn at the end of the cargo, and just as I went to make the turn all the lights went out.

"Q. What happened to you? A. Well, I got a jump and as I jumped my feet went out from under me.

"By the court:

"Q. The lights went out. Did you move after the lights went out? A. If I can remember right, I finished that last step, sir.

"By Mr. Goldstein:

"Q. What kind of step were you making? A. I would say—

"Q. I mean in what direction were you going? A. I was still heading to the end; I was just about at the end of the deck to make my turn to my right.

"Q. In what direction? A. Towards the street."

On cross-examination (N.T. pp. 30, 31):

"Q. Surely you have some idea. Don't you know? Did you turn to the right or left immediately before you fell or did you continue on straight? A. I started to turn when the lights went out, when I slipped and fell in the ditch.

"Q. You started to turn— A. I passed the cargo."

On examination by the court (N.T. pp. 35, 36):

"A. I had walked to the end of the cargo; just exactly to the end of the cargo when the lights went out.

"Q. It was about 16 or 20 feet you had walked when the lights went out? A. Yes, sir; near that.

"Q. How far did you walk after the lights went out? A. I didn't walk, I fell just as the lights went out.

"Q. Well, did you take a step after the lights went out or were you in the course of taking a step when the lights went out? A. I was in the course of taking a step when they went out; I can remember that.

"Q. You were in the course of taking a step when the lights went out? A. Yes.

"Q. Are you sure about that? A. Yes, I am.

"Q. And it was then that you plunged down? A. Yes."

Elsewhere the plaintiff testified that the floor of the pier was wet (N.T. p. 18).

For the defendant, it was testified that by actual measurements the distance from the doorway through which the plaintiff had entered the pier to the edge of the depression where the tracks were laid was about 59 feet. The witness Bierling also testified that there was no such pile of cargo as the plaintiff testified to, the inference being that the plaintiff could have turned to his right and sought egress from the pier at a distance much greater than two feet from the depression where the railroad tracks were.

The defendant also adduced testimony to the effect that the extinction of the lights was due to the breaking of a power line (operated by the defendant) and that the breaking of it was caused by the accumulation of sleet and ice formed in the course of a snowstorm that had been raging.

As to defendant's Motion for Judgment N.O.V.:

Defendant contends that the plaintiff failed to show negligence on the part of the defendant and, in any event, was guilty of contributory negligence, wherefore the Motion for Judgment N.O.V. should be granted.

■ I reject this contention. For the claimed failure of the plaintiff to show negligence, the defendant relies upon a line of Pennsylvania cases which hold that the mere breaking of an electric wire presents no facts from which alone an inference of negligence can be drawn by the jury. These cases are distinguished from the instant case, however, by the fact that the plaintiff was an invited or business guest on the pier; there was a contractual relationship between the plaintiff and the defendant, and under such circumstances the line of cases relied on by the defendant does not apply: Kepner v. Harrisburg Traction Co., 183 Pa. 24, 31, 38 A. 416; Aument v. Pennsylvania Telephone Co., 26 Pa. Super. 610. The instant case falls within the principle of the Kepner case, supra, that where the thing which causes the injury is shown to be under the management of the defendant (i.e., the lighting system) and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the accident arose from want of care: Murray v. Philadelphia & Reading Railroad Co., 249 Pa. 126, 94 A. 558.

■ The defendant also argues that it explained the failure of the lighting by the evidence as to the accumulation of sleet and ice that caused the electric wire to break; but, as the plaintiff correctly points out, the defendant has failed to show that the storm was unusual in violence: Siegfried v. South Bethlehem Borough, 27 Pa. Super. 456; and consequently the jury was at liberty to reject the explanation as exculpation.

On the score of contributory negligence, a weightier problem is presented. The plaintiff knew, as he approached the end of the line of cargo, that a dangerous condition existed in front of him. He knew that he had to turn immediately to his right to avoid danger and seek an exit from the pier. Ordinary prudence would dictate a complete cessation of movement until the lights were restored, and at least a cautious progress around the line of cargo, accompanied by feeling his way with his hands on the cargo.

However, the plaintiff testified that when the lights went out he "got a jump" and fell. Counsel for the plaintiff takes this to mean that he was startled, that he made some involuntary movement and fell. On the other hand, the plaintiff testified, as above quoted, that when the lights went out he was in the course of making a step; that he completed the step and fell. This would seem to indicate that completion of the step commenced before the lights went out and that the step would have brought him over the edge of the pier even if the lights had remained burning, whence it would follow that the failure of the lighting had nothing to do with the fall. It is open to some doubt that the natural and probable consequence of the sudden darkness would be to startle the plaintiff over the edge, so to speak. Elsewhere the plaintiff testified that he slipped and fell; he might have rolled off the edge of the pier, and the slipping might be contributed to the wetness of the floor, though this does not seem to be plaintiff's theory of the case.

■ The uncertainty, however, of the testimony as to the precise nature of the events that occurred, coupled with the fact that the jury has already rendered a verdict for the plaintiff, causes me to deny the Motion for Judgment N.O.V. on the score of contributory negligence.

As to the defendant's motion for a new trial:

In my opinion the motion for a new trial should be granted. The verdict here was clearly against the weight of the evidence and, further, was excessive.

According to the plaintiff's testimony, he started ashore at about 5:55 P.M. and the lights were then burning. The defendant's witness Bierling testified that the lights went out at 5:40 P.M. Defendant's witness Witte also testified that the lights went out at 5:40 P.M. and that this occurrence and the time of its happening were noted in a "log book". With respect to the time of the happening of the accident, the plaintiff testified (N.T. p. 9) that he finished his work about 5:30 P.M.; that he then took his bath and started ashore. He fixed the time that he started ashore as "approximately five or ten minutes to six". The plaintiff's normal afternoon shift, he testified, was from 4:00 to 6:00 P.M. Accepting the plaintiff's statement that he finished his work as a messman at 5:30 P.M., it seems highly improbable that he was able to take a bath and ready himself within ten minutes so as to leave the ship by 5:40 P.M., when the defendant's witnesses testified the lights went out. Even assuming for the sake of argument that the lights went out somewhere between 5:50 and 6:00 P.M., it seems unlikely that the plaintiff could have finished his work at 5:30 P.M., taken his bath, left the ship, entered the pier, and traversed the 18 or 20 feet of the pier, as he testified.

In this connection, it must be recalled that the plaintiff testified that the distance between the doorway to the pier and the edge of the pier was about 20 or 22 feet, while actual measurements taken by the defendant and testified to by its witnesses disclosed that the width of the pier was 58 feet 11 inches. It is well settled that where actual measurements are taken by a witness, testimony as to such measurements as to distance must prevail over "guesses" testified to by another witness.

Taken all in all, I am of the opinion that the verdict was against the weight of the evidence and was a "sympathy" verdict in every respect.

As to the excessiveness of the verdict:

Plaintiff was taken to the hospital following the accident and remained there until January 30, a period of two weeks, when he was discharged with the notation on the hospital records that his condition was "good". The injuries suffered by the plaintiff consisted of abrasions and contusions, mostly to the left hand and to the left side in the region of the ribs. There were no fractures. Treatment consisted of external medication, diathermy, and strapping; also internal medication. On February 12, almost two weeks following his discharge from the hospital, the plaintiff consulted Dr. Chaess.

Dr. Chaess's examination revealed pain in the right occipital and right parietal region of the head; pain in the back of the neck and on the left side of the neck. Plaintiff felt pain on moving his neck or rotating his head, and pain of the left rib and left chest and left ankle; he suffered abrasions and contusions. Treatment lasted from February 12 to March 25. The plaintiff made ten visits to the doctor during that period, and the doctor's bill was $30. The doctor discharged him on March 25, at which time he did not consider the patient fully recovered, but felt that treatment could do no more, and advised the plaintiff to "lay off and take it easy for a few months with the hope that everything would right itself". The plaintiff's side was no longer strapped when the doctor discharged him, but he was still complaining of headache, dizziness and limitation of function of the left hand. The doctor testified that in his opinion the plaintiff had suffered injury to the soft tissue between the lateral and ulnar nerves of the left arm. At the time of the patient's discharge he still had some difficulty with his left leg in walking, but it was greatly improved under the heat therapy. The doctor advised the plaintiff to wear a corset for a while as a support and to relieve pain.

The plaintiff's salary at sea was computed by him at $113.50 a month, consisting of $77.50 in cash plus maintenance. He also testified that it cost him about $20 or $25 a week to live in Philadelphia (off the ship). He testified that he did not "get to feeling very good until about some time in July" when he resumed his duties. He returned to work on July 10, 1941, so that he was away from his employment for approximately six months.

There was no very cogent testimony, however, that the plaintiff was actually disabled from work for six months. The nature of the injuries does not impress me as being such as to cause so long a cessation from a steward's duties. As previously stated, there were no fractures. The plaintiff's physician, upon cross-exami-

nation, seemed content to sum up the injuries as consisting of a sprain or sprain plus contusions. There was no treatment after March. I think the plaintiff was physically able to return to work earlier. Under all the circumstances, I think the verdict is substantially excessive.

It is ordered that the defendant's Motion for Judgment N.O.V. be and it is hereby denied, and that the defendant's motion for a new trial be and it is hereby granted.